Shauck, J.
It appears, not only from the portions, of the charge contained in the foregoing statement, but. from the entire charge, that the trial .judge was of the opinion. that the terms of the deed from Williams to the state conclusively fixed, the charr acter of the land conveyed, as lands .to be used, not for the purpose of the construction of the canal, but in aid of the canal fund. In the view thus presented, the state could acquire lands for the purpose of such construction only by appropriation. This view of the law must have controlled the jury, and it led to the instruction given as to the effect of the deeds from the state to May and Kirkum. These instructions, considered together, resulted in the conclusion that by the later deeds the state was necessarily divested of all the *531 title' in the lots named which it had acquired by the deeds from Williams, notwithstanding that in the meantime it had constructed the canal, and the substituted channel for Wolf Run.
This view is quite at variance with the provisions of the acts of February 4, 1825 (2 Chase, 1472), and February 7, 1826 ( 24 O. L.,-58). These acts coritemplated that “lands," waters and streams” - would be acquired by the state' for the actual construction of its canals, including-“feeders, dikes, locks, dams- and such other works and devices as they (the canal commissioners) may .think proper for making said improvement's,” and lots and' lands not needed for the construction and operation of the canals, but .acquired by donation or otherwise, to be sold or leased and the proceeds used in aid of such construction. The effect of the legislation looking to the establishment- Of the canal system of the state was that it acquired an unrestricted title in fee to all the lands of which it in any manner took possession for the purposes of such construction. Malone v. Toledo, 34 Ohio St., 541; Ohio ex rel. v. The P., C., C. & St. L. Ry. Co., ante, 189. It follows that if the state actually devoted the lands in' question to any of the numerous purposes of construction ■ above quoted, they thereby became, in contemplation of the statute, a part of the canal system. The circumstances under which the Williams deed was executed would indicate that it was then contemplated that the lots would be used as they in fact were used; that is, partly for canal construction, and partly in aid of the canal fund. It was not a deed of gift, and it contained no such restrictions as would be effective to prevent its use by the state for either or both of the purposes'indicated. When inter *532 preted in connection with the provisions of the statute under which it was executed, it is entirely clear that it did not limit the power of the state to use the lands as indicated in the instructions given and in refusals to instruct as requested.
The view that the deed from Williams to the state gave to the lots the unchangeable character of lands devoted to the aid of the canal fund, and incapable of being devoted to the purpose 'of canal construction, led to the effect given by the court to the subsequent deeds from the state to Ketchum and May, since it in effect determined that those deeds divested the state of all the title it had acquired from Williams unless there had been a distinct appropriation of a portion of the lots for the purpose of construction, and that appropriation was elsewhere defined to be the exercise by the state of its power of eminent domain. It is not thought by counsel for the defendant in error that the act of February, 7, 1826, authorized the canal commissioners to sell and the governor to convey any portion of the canals, and the statute would not admit of that view. The only purpose then prompting the general assembly was the establishment and maintenance of the system of canals. The lands in controversy are in and contiguous to the basin next below the portage summit level. Within the two miles of this basin and north of it are more than twenty locks, and the waters stored in the basin and those conducted through the substituted channel of Wolf Run are used in locking boats to and from the level of the Cuyahoga valley. If it were now an open question it would not seem difficult to demonstrate that the basin and the channel are necessary to the operation of the canal. But that they are, was conclu *533 sively determined by the commisioners when they constructed them as a part of the canal.
It is agreed by counsel that the waters of Wolf Run, at a level below that of the basin in dispute, are used for locking boats and the surplus for hydraulic purposes. The authority of the canal commissioners to sell was conferred and restricted by the second section of the act of February 7, 1826: ‘•That the canal commissioners are hereby authorized and empowered to sell all such lands and town lots as heretofore have been, or may hereafter be given, granted or ceded to the state for the benefit of the canal fund, other than those which ■ are situated at points or places on or adjoining the line of the Ohio canals where the surplus water produced by said canals can be advantageously used for hydraulic purposes. ’ ’ The authority of the governor to grant did not exceed that of the commission to sell.
It affirmatively appears from the plat of the former proprietors that the disputed boundary of these lots was not located when the plat was made. The plaintiff, not being in possession, was not entitled to recover until she had established her own title. It was incumbent upon her to show a subsequent location of such boundary inconsistent with the present claim of the state. Whether the voluminous bill of exceptions contains any evidence to establish such location is a question whose determination would serve no useful purpose in view of the conclusions already stated. The same observation may be made of the other questions presented by the record and argued by counsel.
The judgments of the cwcuit court and the court of common pleas will be reversed.